# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 1, 2015 at Jackson

## STATE OF TENNESSEE v. BRANDON D. FORBES

**Appeal from the Criminal Court for Davidson County**
**No. 2013-B-1760      Mark Fishburn, Judge**

---

**No. M2014-02492-CCA-R3-CD – Filed November 17, 2015**

---

Aggrieved of his Davidson County Criminal Court jury convictions of two counts of aggravated assault, the defendant, Brandon D. Forbes, appeals, challenging the admission of his prior conviction of aggravated robbery for impeachment purposes, the admission of certain testimony from a State's witness, and the sufficiency of the convicting evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROGER A. PAGE and TIMOTHY L. EASTER, JJ., joined.

Dawn Deaner, District Public Defender; Emma Rae Tennant (on appeal); and Mary Kathryn Harcombe and Ellen Forrester (at trial), Assistant District Public Defenders, for the appellant, Brandon D. Forbes.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General (Senior Counsel); Victor S. Johnson III, District Attorney General; and Sarah Davis, Jeremy Johnson, and Janice Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Davidson County grand jury charged the defendant with the March 27, 2013 assaults of Tiffany Lind and Devon Meily.

At the July 2014 trial, victim Tiffany Lind testified that in the spring of 2013, she lived in a small, two-bedroom apartment with her three children, her boyfriend, Mr. Meily, and their co-worker, Drew Stephens. Ms. Lind said that the duplex had an adjacent parking lot with room to park seven cars and that parking was permitted at the

building across the street, which was owned by the same landlord. On March 27, 2013, one of Ms. Lind's neighbor's, Amanda Ruegge, knocked on her door and demanded that her roommates move one of their cars so that she could park in front of her apartment. Ms. Lind said that she refused and reminded Ms. Ruegge that parking in the lot was "first come first serve[d]." A few minutes later, the defendant, who was Ms. Ruegge's boyfriend and whom Ms. Lind knew as "Beatrice," knocked on Ms. Lind's door and demanded that Ms. Lind move one of the vehicles "or they weren't going to be there anymore, they were going to be disabled and none of them were gonna move." Ms. Lind said that she repeated "'first come first serve[d] on the parking, I don't have to move. If there isn't a spot, park in the street.'" She described the defendant as "[i]rate."

Ms. Lind said that at that point, she went to wake Mr. Meily, who was sleeping because he worked the third shift, and asked him to move his car so as to avoid any further confrontation with the defendant or Ms. Ruegge. Mr. Meily went outside to move his car, and Ms. Lind telephoned the landlord, who lived in California, to alert him to the problem about the parking. A short time later, she saw Mr. Stephens jump from the couch and run into the parking lot. She followed. When she got outside, Ms. Ruegge began berating her and demanding that she move her vehicle. Ms. Lind said that she "started yelling at [Ms. Ruegge], . . . . 'I do not have to move my vehicle, none of us have to move our vehicle. It's first come first serve[d] on the parking.'" She recalled that as she walked toward Ms. Ruegge, the defendant began yelling at both Ms. Ruegge and Ms. Lind. The defendant then struck a nearby parked car with his hand, and Ms. Lind began to back away. She demanded that the defendant "back up, get out of my face," and the defendant "slammed [her] to the ground." Ms. Lind struck her elbow and shoulder and "cracked [her] head against the ground." As she tried to get up, the defendant stood over her "screaming" and pointing a gun at her. Ms. Lind said that, at that point, the defendant became "distracted," and she was able to get up and walk toward her neighbors who had gathered outside. She eventually made her way into a neighbor's apartment, where she called 9-1-1.

Ms. Lind testified that during the incident she feared for her life and her children's safety. Ms. Lind confirmed that neither she nor Mr. Meily was armed and that neither had threatened the defendant or Ms. Ruegge. After speaking with the 9-1-1 dispatcher, Ms. Lind walked back outside to find that the defendant and Ms. Ruegge had gone and that Mr. Meily and "the other neighbors . . . were still out there trying to deal with the accident portion of the evening." She said that the police arrived in 15 to 20 minutes.

Ms. Lind said that the defendant returned after the police left and that "a day or two" later, he approached her and tried to apologize. Ms. Lind later identified the defendant from a photographic array.

During cross-examination, Ms. Lind acknowledged that arguments over parking at the duplex had been ongoing but denied that she and Ms. Ruegge had previously "gotten into it." She said that the defendant stepped in between her and Ms. Ruegge and grabbed her face "[l]ike a basketball" and threw her to the ground. She said that she was very familiar with guns but could not identify the type of weapon that the defendant possessed because it was too dark that night to see.

Walter Sawyers, who lived in the same complex as Ms. Lind and the defendant, testified that there were no assigned parking spaces. He said that on the day of the offenses, he was "out there wiping [his] car" when the defendant and Ms. Ruegge arrived. He said that the defendant, who was "a little bit tipsy," knocked on Ms. Lind's door and told them to move the car. He recalled that the defendant "wasn't saying it in no nice way . . . he was tipsy and cussing." Mr. Sawyers said that Mr. Meily came outside and "tried to move it, but he was still arguing with him and the guy was so upset trying to hurry up and move the car" that he hit Mr. Sawyers's wife's car. Mr. Sawyers told Mr. Meily to stay put, "and then that's when the ruckus started." He testified that Mr. Meily tried to explain that he could not move his car any further because he had struck the other vehicle, and then the defendant "out of nowhere . . . pulled out a gun and hit the man upside the head." Mr. Sawyers identified the defendant as the perpetrator from a photographic lineup.

Devon Meily testified that in March 2013 he lived with Ms. Lind and Mr. Stephens and Ms. Lind's children. He said that parking spaces were not assigned for the tenants and that the parking lot did not even have lines painted to form parking spaces. He said that when the evening's events began, he was sleeping because he worked the night shift. He recalled that near "twilight," Ms. Lind woke him and told him to move his vehicle "because the neighbors were yelling and screaming" and threatening to disable his vehicle. He said that he got up, put his shoes on, and walked outside, where he was greeted by the defendant, who was "drunk and belligerent" and "yelling and screaming about moving the vehicle." He recalled that the defendant was also "bickering" with Ms. Ruegge.

Mr. Meily said that he was "stressed out a little bit" by the defendant's behavior and "still a little dazed from waking up," which led to his hitting Mr. Sawyers's wife's vehicle. He said that he did not see the car. Mr. Sawyers told Mr. Meily to "stop and get out," and Mr. Meily complied. The defendant continued "yelling and screaming at [Mr. Meily] to move the vehicle." A short time later, he looked over to see Ms. Lind "on the ground and [the defendant] up above her yelling and screaming in her face." Mr. Meily walked toward the defendant and got the defendant's attention. At that point, the defendant "reacted and turned back and slapped [Mr. Meily] in the face with a pistol that

-3-

he was holding that [Mr. Meily] had not seen previously." He recalled the defendant's "scream[ing] obscenities in threatening manners like 'today's not the day to f\*\*\* with me, I'll kill everybody in the apartment,' . . . just very violent, very threatening." Mr. Meily could not describe the gun beyond saying that it was black and that it was not a revolver. He said that the defendant's blow "busted [his] lip a little."

Mr. Meily said that he feared for his "life, the life of all the children, the life of [Ms. Lind], just general well-being of everybody." After striking Mr. Meily, the defendant continued "screaming 'don't call the cops,' this and that, and after . . . a few more moments, someone said the cops were called, and then [the defendant] proceeded to run to the vehicle where his girlfriend was at, jumped in, and they took off." Mr. Meily said that the only injury he received was a minor cut in his mouth and some swelling of his lip. Mr. Meily later identified the defendant from a photographic array.

Amanda Ruegge testified on behalf of the defendant that the defendant did not have a gun during the March 27, 2013 incident with Ms. Lind and Mr. Meily. Ms. Ruegge said that on that date, she got into an argument with Ms. Lind over parking because Ms. Lind and her roommates were taking up three of the four available parking spots. She said that it was her understanding that tenants were supposed to park near their apartments and that only one vehicle was allowed per apartment. Ms. Ruegge said that, initially, she asked Ms. Lind nicely to move one of the cars but that Ms. Lind "disrespected" her, and then she "blew the roof." Ms. Ruegge testified that as the argument became more heated, she was "ready to take it to the next point after that because [she] was pissed off." She insisted, however, that Ms. Lind escalated the exchange, saying, "[I]t didn't get too heated to where I wanted to pop her up side the head until she called me the B word, just gonna be honest." She said that the defendant walked up and "as usual put his two senses in," which "didn't help the situation or stop us from arguing." The defendant "started cussing [Ms. Lind] too, he called her out of [sic] her name and told her to go get her dude and tell him to move his car." Ms. Ruegge recalled Ms. Lind's falling but said that she did not recall that anyone pushed her.

Ms. Ruegge testified that, at some point, the defendant began arguing with Mr. Meily, "cussing him," and then the defendant "bumped" Mr. Meily's head, which she described as the defendant's pushing Mr. Meily's head back with his forefingers. She said that Mr. Meily "got real nervous and scared and moved his vehicle" and then struck the vehicle owned by Mr. Sawyers's wife. She said that the police were called because of the car accident. She said that Mr. Sawyers was "going off and he was snapping on everybody and he called the police." Ms. Ruegge told the defendant to get into the car and leave because she did not want to "be involved with the police."

-4-

During cross-examination, Ms. Ruegge testified that she did not like Ms. Lind, that the two had argued on other occasions, and that she was "ready to smack the crap out the woman" on March 27, 2013. She said that she and the defendant had dated for two years and that she still loved him, explaining, "I love the man, I have love for him, but I would never be with him again in my life." She admitted that she did not "want to see nothing happen to him [sic]." She denied arriving with the defendant on March 27, 2013, saying instead that she arrived by herself. She said that she "could have" parked her car on the street, but she chose instead to go and demand that Ms. Lind or her roommates move one of their vehicles. She claimed, however, that she "was being respectful at first." She insisted that the defendant did not go to Ms. Lind's door. She also maintained, contrary to all the other witnesses, that the defendant struck Mr. Meily before Mr. Meily went to move his vehicle. Ms. Ruegge acknowledged that she and the defendant specifically targeted Ms. Lind and Mr. Meily because "[s]he had three vehicles in the yard with four parking spots." She insisted, again, that "he was calling the police because to make a[n] accident report from where he just hit his car, it's not dealing with me or" the defendant.

On redirect, Ms. Ruegge admitted that a detective had attempted to interview her but said that she "really didn't want to . . . I don't like being involved with . . . you guys, I don't."

After a full *Momon* colloquy, the defendant elected not to testify.

Based upon this proof, the jury convicted the defendant as charged of two counts of aggravated assault. Following a sentencing hearing, the trial court sentenced the defendant, a Range II offender, to concurrent sentences of eight years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by ruling prior to trial that the State would be permitted to use the defendant's prior conviction of aggravated robbery as impeachment evidence, that the trial court erred by permitting the State to question Mr. Meily about his traveling from Florida for the trial, and that the evidence was insufficient to support his conviction of the aggravated assault of Ms. Lind.[1] We consider each claim in turn.

## I. Prior Convictions

Before the defendant's trial, the State provided notice that it intended to use the defendant's prior convictions of criminal impersonation, aggravated robbery, and

---

[1] The defendant does not challenge his conviction of the aggravated assault of Mr. Meily.

-5-

theft as impeachment evidence should the defendant choose to testify at trial. The defendant objected, arguing that the criminal impersonation conviction was outside the 10-year time limit specified in Tennessee Rule of Evidence 609 and that the aggravated robbery conviction was too similar to the crime for which the defendant was on trial. The trial court ruled that the State would be permitted to use the aggravated robbery and theft convictions, but, as to the aggravated robbery conviction, suggested that the State use the term "robbery-related offense." On appeal, the defendant claims that the trial court erred by concluding that the aggravated robbery conviction could be used for impeachment because that conviction is too similar to the charged offenses of aggravated assault.

Subject to certain conditions for admissibility, Tennessee Rule of Evidence 609 authorizes the use of proof of a witness's prior convictions to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). To be eligible as an impeaching conviction, a prior felony conviction need not involve dishonesty. When the witness to be impeached is the criminal defendant, the State must give notice prior to trial of its intent to utilize the conviction for impeachment purposes, Tenn. R. Evid. 609(a)(3), and upon request, the court must determine the admissibility of an eligible conviction by deciding whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues," *id.* In making this determination, "two criteria are especially relevant." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). First, the court must "analyze the relevance the impeaching conviction has to the issue of credibility" and "explain [the relevance] on the record," *id.*, and second, it must, "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction,'" *id.* (quoting Cohen, Sheppeard, Paine, *Tennessee Law of Evidence* § 609.9 at 376 (3d ed. 1995)). If the conviction is remote, that is, if more than 10 years have elapsed from the date of release from confinement or from the date of conviction if no confinement was involved, the prior conviction may be admissible when the adverse party gives advance notice of intent to use the conviction, and the court determines that in the interests of justice the conviction's probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 609(b). On appeal, the trial court's decision to admit prior convictions for impeachment purposes will be reversed only when it appears that the trial court abused its discretion. *See, e.g.*, *Mixon*, 983 S.W.2d at 674.

As indicated, the trial court acknowledged the potential similarity between the defendant's conviction of aggravated robbery and the charged offenses, and, mindful of the danger described in *Mixon*, ruled that the State would be permitted to use the conviction for impeachment but warned the State not to mention that the aggravated robbery involved the use of a deadly weapon and suggested that the State use the term "robbery-related offense" in place of aggravated robbery. In our view, the trial court did not abuse its discretion by making this determination. Aggravated robbery is a crime

involving dishonesty because it encompasses theft, and that offense is not so similar to the conviction offense as to preclude its use for impeachment in this case. *See, e.g.*, *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). Moreover, theft bears a substantial relationship to credibility. *See, e.g., State v. Wendell Ray Williams*, No. M2001-02296-CCA-R3-CD (Tenn. Crim. App., Nashville, Apr. 4, 2003).

## II. Testimony of Mr. Meily

The defendant next contends that the trial court erred by permitting the State to elicit from Mr. Meily testimony that he had traveled from Florida to testify at trial. The State asserts that the admission of the testimony was proper and that, in the alternative, erroneous admission of the testimony was harmless.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Prior to trial, the defendant moved the trial court to prohibit the State from eliciting testimony that Mr. Meily lived in Florida. The State argued that the testimony tended to bolster Mr. Meily's credibility. The court ruled that "where [Mr. Meily] lives . . . is absolutely admissible . . . the jury has a right to know something about the witnesses who are coming in to testify to evaluate their credibility . . . basic general background information is always relevant on any witness."

That Mr. Meily traveled from Florida to testify is not particularly relevant to any fact at issue, but neither is it particularly prejudicial. Thus, although the testimony at issue was only marginally relevant, we do not believe that the trial court abused its discretion by admitting it.

## III. Sufficiency

Finally, the defendant argues that the evidence was insufficient to support his conviction of the aggravated assault of Ms. Lind, pointing particularly to what he deems "troubling inconsistencies" in the testimony offered by the State's witnesses. The State avers that the evidence was more than sufficient to support the conviction.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits aggravated assault," as charged in this case, "who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [i]nvolved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iv). "A person commits assault," as charged here, "who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

The evidence adduced at trial, examined in the light most favorable to the State, established that the defendant and Ms. Ruegge started a fracas involving Ms. Lind and Mr. Meily over a parking space. Refusing to back down from having been "disrespected," Ms. Ruegge engaged Ms. Lind in a shouting match while Mr. Meily attempted to move his vehicle. Frightened by the defendant's violent haranguing, Mr. Meily struck Mr. Sawyers's wife's car with his own. When Mr. Meily got out of his car to deal with Mr. Sawyers, the defendant intervened in the argument between the two women, pushing Ms. Lind to the ground and pointing a gun in her face. Ms. Lind testified that she feared for her life as she lay on the ground. Mr. Meily, who had turned to see the defendant over Ms. Lind, got the defendant's attention, and the defendant struck him in the face with the gun he was holding. This evidence overwhelmingly supports the defendant's conviction. We may not indulge in the defendant's invitation to reevaluate the credibility of the witnesses or revisit inconsistencies in the testimony because both lay solely within the purview of the jury as the trier of fact. *See Cabbage*, 571 S.W.2d at 835.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE